UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                              :

OUI FINANCING LLC,              :

                            :

                 Plaintiff,    :

                            :

          -v-                  :

                            :

STEVEN DELLAR and OUI MANAGEMENT :
SAS,                                :

                            :

               Defendant.   :

                            :
--------------------------------------------------------X

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: OCT 09 2013

No. 12 Civ. 7744 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

    Plaintiff Oui Financing LLC ("Oui Financing") brings this declaratory judgment, breach of contract and fraud action against Defendants Steven Dellar and Oui Management SAS ("Oui Management"). Defendants move the Court pursuant to Federal Rules of Civil Procedure 12(b)(3) and 12(b)(6) on the grounds that the doctrines of international comity and forum non conveniens require dismissal and alternatively that Plaintiff's fraud claim should be dismissed as duplicative of its breach of contract claim. Plaintiff cross-moves for partial summary judgment on its declaratory judgment and breach of contract claims against Dellar. The Court agrees with Defendants that comity is warranted. Accordingly, Defendants' motion to dismiss is granted, and Plaintiff's partial summary judgment motion is denied.

### 1.  Factual Background[1]

    On August 27, 2010, pursuant to a loan agreement and promissory note, Plaintiff made

---

[1]    The information in this section is drawn from the allegations in Plaintiff's Amended Complaint, the exhibits attached thereto and matters of which the Court may take judicial notice. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

loans to Oui Management, a French *société par actions simplifiée*[2] with its principal place of business in Paris. (Am. Compl. ¶¶ 1, 6, Exs. B, C.) Dellar, the president and a shareholder of Oui Management, contemporaneously executed a guaranty pursuant to which he unconditionally guaranteed repayment of the loans and other related sums. (Id. ¶¶ 1, 7, Ex. A.) The principal, interest and other amounts due under the loans were required to be paid in full no later than September 30, 2012, but Oui Management and Dellar did not make payment. (Id. ¶ 12.) Rather, on September 24, 2012, Oui Management voluntarily commenced a *procédure de sauvegarde* ("safeguard procedure") in the Paris Commercial Court. (Id. ¶ 16, Ex. B.)[3]

Oui Management's commencement of the safeguard procedure constituted an automatic event of default under the loan agreement. (Id. ¶ 16.) Plaintiff sent Oui Management a letter on October 2, 2012 demanding it be paid the money owed under the loan agreement. (Id. ¶ 17.) Oui Management responded on October 8, 2012, advising Plaintiff that, due to the safeguard procedure, it was prohibited under French law from paying any debt that accrued before September 24, 2012. (Id. ¶ 18, Ex. G.)

On October 17, 2012, Plaintiff filed a complaint asserting declaratory judgment and breach of contract claims against Dellar alone. (Dkt. 1.) On November 27, 2012, Dellar moved to dismiss. (Id. 5.) After that motion was fully briefed, but before the Court issued a ruling, Plaintiff received leave from the Court to file the Amended Complaint, which Plaintiff filed on March 8, 2013. (Id. 19.) The Amended Complaint named Oui Management as an additional Defendant and asserted new claims for breach and fraud. (Id. 18.) Before the Court are

---

[2]     "A *société par actions simplifiée* . . . is a form of a simplified French business entity and is treated as a corporation under French law." Pritired 1, LLC v. United States, 816 F. Supp. 2d 693, 697 n.1 (S.D. Iowa 2011); see also In re Air Crash at Belle Harbor, New York on November 12, 2001, No. MDL 1448 (RWS), 2006 WL 1288298, at *2 (S.D.N.Y. May 9, 2006) (equating a *société par actions simplifiée* to a limited liability company).

[3]     As discussed in further detail below, the French safeguard procedure affords a distressed, but not insolvent, company a mechanism through which it may restructure its indebtedness and continue to operate its business.

Defendants' motion to dismiss the Amended Complaint and Plaintiff's cross-motion for partial summary judgment.

Shortly before briefing was completed, on May 13, 2013, the Paris Commercial Court issued a judgment approving Oui Management's "safeguard"—i.e., restructuring—plan, which provides for the repayment of Oui Management's debts over a seven-year period.[4]

## 2. French Safeguard Procedure[5]

"[A] comprehensive reform of French bankruptcy law, known as the Business Safeguard Act was enacted on July 26, 2005 and became effective on January 1, 2006." Stephen J. Lubben, Business Liquidation, 81 Am. Bankr. L.J. 65, 84 n.64 (2007); see also Eric Cafritz and James Gillespie, French Bankruptcy Law Reform Assessed, Int'l Fin. L. Rev., Dec. 2005, at 41 (hereinafter, "Cafritz"). A centerpiece of the Business Safeguard Act is the safeguard procedure, which, under the provisions of the French Commercial Code, is:

> instituted and opened on the application of a debtor . . . who, without being insolvent, shows proof of difficulties that he is not in a position to surmount. This procedure is aimed at facilitating the reorganization of the [business] in order to permit it to continue its economic activity, maintain jobs and discharge its debts.

French Comm. Code ("FCC"), Art. L 620-1; see also Anja Droege Gagnier, *French Safeguard*

---

[4]    While the Paris Commercial Court issued a judgment adopting the safeguard plan on May 13, 2013, see Balensi Reply Aff Ex. 3, it apparently did not provide Defendants' counsel with a full opinion until May 28, 2013. This latter document, of which the Court may take judicial notice, see Sprague & Rhodes Commodity Corp. v. Instituto Mexicano Del Cafe, 566 F.2d 861, 862 (2d Cir. 1977), was submitted to the Court by letter. Because it is a judicial document, see Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119 (2d Cir. 2006), the Court has docketed the letter and the attached opinion.

[5]    "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. "The court's determination must be treated as a ruling on a question of law." Id. Accordingly, although the Court relies primarily on its independent examination of the relevant provisions of the French Commercial Code, the Court has considered two affidavits submitted by Defendants' French counsel, Julien Balensi, in connection with Defendants' opening and reply briefs. The Court has also considered an affidavit submitted by Plaintiff's French counsel, Marie Danis, in connection with Plaintiff's opposition brief. Mr. Balensi and Ms. Danis are partners in prominent Paris law firms and both are experienced in matters of corporate restructuring. Although Mr. Balensi and Ms. Danis contest specific points made in each other's affidavits, neither party suggests that the other is unqualified to assist the Court in determining French law. Unless otherwise noted, the Court has relied on the translation of the French Commercial Code available on Westlaw. See The French Commercial Code in English (Philip Raworth, trans., Thompson Reuters 2010) ("Raworth Translation").

*Proceedings: Paris Court of Appeal Controls the Risk of Abuse*, 4 Insolvency & Restructuring Int'l 2, 17 (2010) (hereinafter, "Gagnier"). The safeguard procedure is therefore a "pre-insolvency" proceeding. Danis Aff. Ex. A ¶ 44.

A safeguard procedure is commenced when a French Commercial Court issues a judgment that serves to open a "period of observation" of the debtor's business. FCC Art. L. 621-3; Balensi Aff. ¶ 2. During the period of observation, the "debtor remains largely in control of its operations." Balensi Aff. ¶ 4. The Commercial Court, however, also appoints certain individuals who play a role in the safeguard procedure. These individuals include:

- a "supervising judge" who "is charged with ensuring the rapid conduct of the procedure and with protecting the interests present." FCC Art. L. 621-4, 621-9;

- an "agent"[6] who is "empowered to act in the name and collective interest of the creditors." Id. 621-4, 622-20; Danis Aff. Ex. A ¶ 7. The FCC provides that "any creditor may request the replacement of the court-appointed [agent]." FCC Art. L. 621-7; and

- a "receiver" charged "to supervise the debtor in his business management or to assist him for all management acts or for certain of them." Id. 621-4; 622-1.

The agent and receiver "keep the supervising judge . . . informed of the progress of the [safeguard] procedure." Id. 621-8.

The Commercial Court's judgment opening the period of observation also serves to prohibit the debtor from "paying any claims arising prior to the judgment." Id. 622-7. It also stays legal proceedings brought by creditors against the debtor or against the debtor's guarantors. Id. 622-21-I, 622-28; Balensi Aff. ¶ 6 ("[T]he commencement of safeguard proceedings triggers a general automatic stay of legal actions against the debtor and its property for pre-petition liabilities or agreements."); see also Cafritz, at 41-42 ("The commencement of a safeguard

---

[6] The FCC uses the term "*mandataire*," which the Raworth Translation translates as "administrator" and the parties translate as "agent." The Court opts for the latter translation.

4

procedure, like a US bankruptcy case, results in an automatic stay against creditors in favor of the debtor and guarantors or joint obligors of the debtor."); Adam Gallagher, *France's New Fast-Track Safeguard Law*, Am. Bankr. Inst. J., Mar. 2011, at 30 ("Safeguard . . . is a public procedure that confers immediate protection from . . . creditor actions . . . The debtor's payment obligations are frozen during the safeguard."). The effect of such a stay is to "give[] the debtor the necessary breathing space to complete its reorganisation." Gagnier, at 17; see also Cafritz, at 41 ("[A] mandatory stay of creditors' claims . . . will give breathing room to companies on the brink of insolvency.").

The supervising judge may also appoint one or more "controller creditors"[7] from among the creditors who request such an appointment. FCC Art. L. 621-10. Controller creditors "assist the court-appointed [agent] in his duties and the supervising judge in his task of supervising the administration of the [debtor's business]" during the safeguard procedure. Id. 621-11. They are entitled to examine all the documents provided to the receiver and the agent, subject to the requirement that they observe confidentiality. Id. 621-11; Danis Aff. Ex. A ¶ 9. The agent is charged with notifying the supervising judge of any "comments" provided to him by controller creditors during the procedure. FCC Art. L. 622-20.

After the procedure is opened, the debtor must provide the receiver and agent with, *inter alia*, a list of its creditors. Id. 622-6. The creditors, for their part, submit "declaration[s] of their claims" to the agent, indicating "the amount of the claim due" and the "nature of the priority or guarantee from which the claim may benefit," as well as other information. Id. 622-24, 622-25. French creditors "are not treated any differently, and do not have any additional or superceding rights over [non-French] creditors in [safeguard] proceedings." Balensi Aff. ¶ 35.

---

[7]     The FCC uses the term "*contrôleurs*," which the Raworth Translation translates as "supervisors." The parties advise the Court, however, that this term is more commonly translated as "controller creditors."

The receiver and the debtor (with expert assistance, if necessary) prepare an "assessment" of the business documenting the "the origin, seriousness and nature" of the debtor's "difficulties." FCC Art. L. 623-1. In light of this assessment, the debtor and receiver propose a safeguard plan which, *inter alia*, "determines the perspectives for restructuring" and "sets out the procedure for settling liabilities and the possible guarantees that the debtor must give to make sure this is done." Id. 626-2, 623-1. The receiver shares the plan with, *inter alia*, the agent and any controller creditor(s). Id. 626-5. The agent, in turn, "draws up a list of the replies [to the plan] given by the creditors," which is forwarded to the debtor, the receiver and any controller creditor(s). Id. 626-7.

Following a hearing on the safeguard plan, in which controller (but not other) creditors may participate, the Commercial Court makes a ruling as to whether to adopt or reject the plan. Id. 626-9; Danis Aff. Ex. A ¶ 12. If the plan is approved, the debtor may then continue its business, subject to its compliance with the repayment plan. Danis Aff. Ex. A ¶ 4. "The judgment adopting the plan renders its provisions binding on everyone," and "persons who have granted a personal guarantee . . . may rely on [i.e., invoke] it." FCC Art. L. 626-11; Balensi Reply Aff. ¶ 20.

The debtor, the receiver and the agent (among others) may appeal the court's decision as to the safeguard plan. FCC Art. L. 661-1; Balensi Aff. ¶ 11; Danis Aff. Ex. A ¶ 13. No creditor, including a controller creditor, may appeal. Danis Aff. Ex. A ¶ 13. Under certain conditions, however, a creditor may challenge the commencement of a safeguard procedure by initiating a *tierce opposition* ("third party objection") proceeding in the Commercial Court. FCC Art. L. 661-2; Balensi Aff. ¶ 34; Danis Aff. Ex. A ¶ 37. "The judgment ruling on the third party objection may be appealed to a court of appeal or to the Court of Cassation by the objecting third

party." FCC Art. L. 661-2.

### 3. Comity Principles

International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." Hilton v. Guyot, 159 U.S. 113, 164 (1895); see also Morgenthau v. Avion Res. Ltd., 11 N.Y.3d 383, 389 (2008) ("The doctrine of comity 'refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states.'" (quoting Byblos Bank Europe, S.A. v. Sekerbank Turk Anonym Syrketi, 10 N.Y.3d 243, 247 (2008))). The doctrine is applied not as "an imperative obligation of courts but rather [a]s a discretionary rule of practice, convenience, and expediency." Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc., 466 F.3d 88, 92 (2d Cir. 2006) (citation and internal quotation marks omitted); see also Johnston v. Compagnie Generale Transatlantique, 242 N.Y. 381, 387 (1926); Morganthau, 11 N.Y.3d at 390 ("Whether to apply the doctrine lies in the sound discretion of the court."). The Second Circuit has explained that "[c]omity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect." Cunard Steamship Co. v. Salen Reefer Servs. AB, 773 F.2d 452, 457 (2d Cir. 1985) (quoting Somportex Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d 435, 440 (3d Cir.1971)). A defendant carries the burden of showing that comity is appropriate. Allstate Life Ins. Co. v. Linter Group Ltd., 994 F.2d 996, 999 (2d Cir. 1993).

The Second Circuit has further "repeatedly held that U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding." JP

Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V., 412 F.3d 418, 424 (2d Cir. 2005);

see also Finanz AG Zurich v. Banco Economico S.A., 192 F.3d 240, 246 (2d Cir. 1999)

("American courts regularly defer to such [foreign bankruptcy] actions."); Allstate, 994 F.2d at

999 ("[W]e have recognized that comity is particularly appropriate where . . . the court is

confronted with foreign bankruptcy proceedings."); Victrix S.S. Co., S.A. v. Salen Dry Cargo

A.B., 825 F.2d 709, 713 (2d Cir. 1987) ("American courts have long recognized the particular

need to extend comity to foreign bankruptcy proceedings.").

The rationale underlying this principle is that "[t]he equitable and orderly distribution of

a debtor's property requires assembling all claims against the limited assets in a single

proceeding; if all creditors could not be bound, a plan of reorganization would fail." Victrix, 825

F.2d at 713-14. In such cases, deference to a foreign court of proper jurisdiction is appropriate

so long as the foreign proceedings are procedurally fair and do not violate public policy. J.P.

Morgan, 412 F.3d at 424; see also Canada Southern Ry. v. Gebhard, 109 U.S. 527, 539 (1883)

(American creditors could not sue debtor in New York and were bound to a foreign

reorganization plan that was approved by a majority of creditors and was consistent with the

"spirit of U.S. bankrupt[cy] law[].").[8]

Courts have extended these principles to pre-insolvency proceedings not dissimilar to

French safeguard procedures that are designed to assist distressed businesses in avoiding

liquidation by relieving them from the immediate pressure of creditors' claims so they may

---

[8]    The comity doctrine in the context of foreign bankruptcy proceedings is applied similarly under both federal and New York law, the latter of which governs this diversity suit. See Drexel Burnham Lambert Grp. v. A.W. Galadari, 777 F.2d 877, 880 (2d Cir. 1985); Ecoban Fin. Ltd. v. Grupo Acerero Del Norte, S.A. de C.V., 108 F. Supp. 2d 349, 352 (S.D.N.Y. 2000) ("As subject matter jurisdiction in this matter is premised on diversity of citizenship, New York law governs. . . . But whether under federal law or New York law, the rule appears to be the same. Under New York law, courts will defer to foreign bankruptcy proceedings unless the foreign court lacks jurisdiction over the bankrupt, or the foreign proceeding will result in injustice to New York citizens, prejudice to creditors' New York statutory remedies, or violation of the laws or public policy of New York.") (citations omitted).

restructure, and ultimately pay, their debts. <u>See, e.g.</u>, <u>Ecoban Fin. Ltd. v. Grupo Acerero Del Norte, S.A. de C.V.</u>, 108 F. Supp. 2d 349, 350-51 (S.D.N.Y. 2000). For example, in <u>J.P. Morgan</u>, a lending bank sued a foreign borrower seeking a declaratory judgment that certain funds held in a collection account at the bank belonged to it. 412 F.3d at 419. The borrower had defaulted on its loan and filed for *suspensión de pagos* ("suspension of payments" or "SOP") in Mexican civil court. <u>Id.</u> at 421. The Second Circuit explained that "[m]uch like Chapter 11 reorganization in the United States, SOP is a judicial order authorized under Mexican law that allows a debtor to suspend payments to its creditors and continue normal operations until such time as the debtor and creditors, under the auspices of the court, reorganize the debt." <u>Id.</u> The court rejected the bank's effort to "use U.S. courts to circumvent" the foreign proceeding and affirmed the district court's dismissal of the bank's suit on comity grounds. <u>Id.</u> at 427; <u>see also</u> <u>Ecoban</u>, 108 F. Supp. 2d at 351 (S.D.N.Y. 2000) (dismissing complaint filed by the domestic holder of past-due promissory notes purchased from Mexican corporations that were subject to SOP proceedings in Mexican courts).

**4.  Procedural Fairness and Public Policy Considerations**

The Paris Commercial Court is a court of competent jurisdiction. FCC Art. L. 621-2 (The French Commercial Court has jurisdiction over debtors engaged in "commercial . . . activity."). As indicated above, the remaining inquiry in the comity analysis is whether the French safeguard procedure is (a) procedurally fair and (b) does not contravene public policy. <u>J.P. Morgan</u>, 412 F.3d at 424. The Court is satisfied that the safeguard procedure meets these criteria.

**a.  *Procedural Fairness***

"[I]n order for comity to be extended, the foreign court must abide by fundamental

standards of procedural fairness." Cunard, 773 F.2d at 457.  In analyzing procedural fairness of foreign bankruptcy proceedings, the Second Circuit has explained that "what is important is that the [foreign] law provides a stay procedure to centralize all claims and 'enable[] the assets of a debtor to be dispersed in an equitable, orderly, and systematic manner.'"  Allstate, 994 F.2d at 999 (quoting Cunard, 773 F.2d at 458).  The Allstate court made equally clear that "there is no requirement" that the relevant foreign proceedings "be identical to United States bankruptcy proceedings."  Id.; see also In re Brierley, 145 B.R. 151, 166 (Bankr. S.D.N.Y. 1992) ("Nothing dictates that the foreign law be a carbon copy of our law.").  Nor must the district court "split hairs" to determine that the foreign proceeding "in general, provides a fair forum in which to litigate [Plaintiff's] claims."  Allstate, 994 F.2d at 999.  That the foreign proceeding "differs slightly" in certain respects from domestic bankruptcy law is therefore "irrelevant."  Id.; see also Ecoban, 108 F. Supp. 2d at 353 (comity appropriate although "some of the Mexican procedures may [have] differ[ed] significantly from their American counterparts").[9]

On these principles, the Court is satisfied that French safeguard procedure affords creditors adequate procedural protections:

- The safeguard regime ensures that claims against the debtor are centralized by imposing stays at the outset of the procedure to prevent creditors from advancing legal claims in other fora and to prohibit the debtor from "paying any claims arising prior to the judgment."

- Creditors are afforded the opportunity to submit their claims to the agent and to inform him or her as to "the amount of the claim due" and as to the "nature of the priority or guarantee from which the claim may benefit," as well as other information.  The FCC makes no distinction between the rights of foreign and domestic creditors.

---

[9]    The Allstate court listed eight illustrative factors to assist courts in addressing the procedural fairness prong of the comity analysis. 994 F.2d at 999. As the Ecoban court explained, "[t]hese factors generally indicate that the foreign procedures must provide adequate notice and opportunity to be heard, and must treat creditors equally." 108 F. Supp. 2d at 352 n.4. As most of these factors "contemplate a liquidation," however, the Ecoban court did not find them to be "clearly relevant or applicable" to pre-insolvency proceedings, like the SOP proceedings there or the safeguard procedure here. Id.

- Creditors' interests in the safeguard procedure are represented by the agent, who is "empowered to act in the name and collective interest of the creditors." As Plaintiff acknowledges, the agent (referred to by Plaintiff as the "creditors' representative") "is responsible for oversight of the claims and interests of creditors" in the safeguard procedure. (Am. Compl. n.27.) The judge supervising the safeguard procedure also is charged with generally "protect[ing] the interests present."

- Creditors who so request may be appointed controller creditors and in that capacity may assist the judge and agent in supervising the debtor during the safeguard procedure, direct comments to the supervising judge, review documents relevant to the procedure and participate in the hearing prior to the decision to adopt or reject the safeguard plan.

- The agent solicits and lists creditors' "replies" to the safeguard plan (i.e., acceptance or refusal), which are submitted to the receiver.

- Dissatisfied creditors may commence a third party objection proceeding in French Commercial Court, the judgment of which may be appealed.

The Court is satisfied that these mechanisms support the French safeguard procedure as a procedurally fair process for creditors. At least one district court found extending comity principles to a safeguard procedure to be appropriate after finding "no reason to determine" that "creditors' interests are not sufficiently protected under French *sauvegarde* law." SNP Boat Servs. S.A. v. Hotel Le St. James, 483 B.R. 776, 786 (S.D. Fla. 2012). Other U.S. federal courts concerned with French judicial proceedings have determined them to be procedurally fair. See, e.g., Int'l Nutrition Co. v. Horphag Research Ltd., 257 F.3d 1324, 1330-31 (Fed. Cir. 2001) (stating that "the French courts abided by 'fundamental standards of procedural fairness,' . . . and [finding] no abuse of discretion in the district court's judgment that international comity should be extended" (quoting Cunard, 773 F.2d at 457)); Gambra v. Int'l Lease Fin. Corp., 377 F. Supp. 2d 810, 817 (C.D. Cal. 2005) (granting motion to dismiss on forum non conveniens grounds in part because "French courts have a rigorous judicial system that seeks to promote fair proceedings and debate.").

Plaintiff's arguments that the French safeguard procedure is not procedurally fair are unavailing. Plaintiff argues that procedural fairness is lacking because creditors may not appeal a judge's decision on the safeguard plan. But the agent, charged with protecting the creditors' interests, may do so. If a creditor is not satisfied that the agent is sufficiently protecting its interests, a creditor "may request [his or her] replacement." The French law also provides dissatisfied creditors with an alternative grievance mechanism: a creditor may initiate a third party objection proceeding to challenge the debtor's opening of the safeguard procedure.

Plaintiff further complains that "[n]o creditor . . . has any right to vote on, consent to or reject a proposed or approved repayment plan" and that its priority rights were "not respected." (Opp'n 4.) These arguments are particularly unimpressive here since, as discussed below, Plaintiff participated in Oui Management's safeguard proceeding, "submitted objections to th[e] repayment plan," (Opp'n 2), and does not dispute that the terms of the adopted plan provide that Plaintiff's loan to Oui Management will be repaid. See Zurich v. Banco Economico S.A., No. 98 Civ. 0005 (SAS), 1998 WL 205341, at *3 (S.D.N.Y. Apr. 28, 1998) (comity appropriate where, *inter alia*, there was no evidence that a Brazilian liquidation proceeding "threaten[ed] the very enforceability of the . . . notes"). In any event, Plaintiff cites no authority for the proposition that a restructuring proceeding must be consensual or must "respect[]" priority rights in order to satisfy basic standards of procedural fairness.

The remainder of Plaintiff's arguments that the French safeguard procedure is not procedurally fair focus not on the law itself, but rather on specific frustrations it encountered during the procedure. The focus of the comity analysis, however, is whether the foreign proceeding "*in general*, provides a fair forum in which to litigate [Plaintiff's] claims." Allstate, 994 F.2d at 999 (emphasis added). That Plaintiff is disappointed with the specific outcome of

Oui Management's safeguard procedure is not relevant. See Ecoban, 108 F. Supp. 2d at 355 ("Ecoban's unhappiness with the results produced by that [SOP] law is not a legitimate ground for denying the laws and courts of Mexico the comity to which American legal precedent and basic principles of international cooperation entitle them."); see also Johnston, 242 N.Y. at 387 (1926) (stating, in the context of reciprocity, "[w]hen the whole of the facts appear to have been inquired into by the French courts, judicially, honestly and with full jurisdiction and with the intention to arrive at the right conclusion, and when they have heard the facts and come to a conclusion, it should no longer be open to the party invoking the foreign court against a resident of France to ask the American court to sit as a court of appeal from that which gave the judgment."); c.f. Italverde Trading, Inc. v. Four Bills of Lading, No. 04-CV-2793 (NGG) (VVP), 2009 WL 499502, at *8 (E.D.N.Y. Feb. 27, 2009) ("In addition to the reasons set forth above, the court is disinclined to allow the bankrupt Italian entity, having adjudicated claims in an Italian court, to proceed here on an issue already decided by the Italian court.").

In any event, Plaintiff's representations that it had no opportunity to be heard during the procedure are belied by documents, attached to its Amended Complaint, demonstrating that Plaintiff was given such an opportunity:

- A December 11, 2012 letter from Plaintiff's U.S. counsel to the receiver reflects that Plaintiff attended a "meeting on November 28th [2012] regarding the safeguard proceeding" which Plaintiff found "useful in clarifying issues and confirming facts." (Am. Compl. Ex. T.) In this letter, Plaintiff voices its position that "Oui Management and its President and controlling shareholder, Steven Dellar, are using the safeguard proceeding for purposes other than the intended goals of the safeguard process," namely, "to avoid their obligations" to Plaintiff. Id. The letter further reflects that the receiver suggested to Plaintiff's French counsel that an independent auditor be appointed "to conduct an independent current business review of Oui Management." Id.

- In a January 11, 2013 letter from Plaintiff's U.S. counsel to the agent, whom Plaintiff describes as "the appointed representative of the creditors of Oui Management in the safeguard proceeding," Plaintiff voiced its position that "[a]ny

objective observer of this situation must conclude that Oui Management and Mr. Dellar are using the safeguard proceeding as for improper purposes, including to continue to misappropriate the collateral of Oui Financing." (Am. Compl. Ex. U.) Plaintiff requested that the agent, "as the representative of the Oui Management creditors," "demand that an independent auditor be appointed immediately." Id. The letter further requests that the agent "support Oui Financing's petition to dismiss the safeguard proceeding and to proceed immediately with the liquidation of Oui Management." Id. The letter finally notes "that a hearing on Oui Financing's objections to the safeguard proceeding is scheduled for January 25th" and requests that the agent "appear at that hearing with Oui Financing's counsel to support Oui Financing's petition." Id.

- The Paris Commercial Court's May 13, 2013 judgment adopting Oui Management's safeguard plan states that "[a]ll of the 13 creditors of Oui Management have been consulted, the holder of Oui Finance [sic] loan representing 80.98% of the liability to be repaid." The judgment notes that Oui Financing "answered the safeguard plan unfavorably."

Contrary to Plaintiff's assertion that it received "no notice of significant developments in the safeguard proceeding," (Opp'n 5), it appears that Plaintiff not only received notice, but was afforded the opportunity to participate in, and voice its opposition to, the procedure. Baker v. Latham Sparrowbush Assocs., 72 F.3d 246, 254 (2d Cir. 1995) ("If a party receives actual notice that apprises it of the pendency of the action and affords an opportunity to respond, the due process clause is not offended."); Finanz AG, 192 F.3d at 249 ("[A]lthough the Brazilian proceeding apparently does not require individualized notice, Finanz received actual notice of the Brazilian proceeding . . . and subsequently filed a timely claim. Accordingly, the District Court correctly concluded that there was no due process violation."); Allstate, 994 F.2d at 1000 (evidence of plaintiffs' participation in foreign liquidation process supported determination that comity was warranted).

In short, the Court finds Plaintiff's attacks on the French proceeding to be, at best, emblematic of precisely the type of hair-splitting the Second Circuit has counseled against. Allstate, 994 F.2d at 999. The Court declines to rule that French safeguard procedures are

14

procedurally unfair.

    **b.**    *Public Policy*

    The Court is also satisfied that French safeguard procedures do not offend public policy. The overarching policy of the French safeguard procedure—to enable distressed debtors to reorganize their debts so as to avoid insolvency and repay their creditors—is the same as the U.S. Bankruptcy Code's "strong policy in favor of reorganization." In re Northwest Airlines Corp., 349 B.R. 338, 380 (S.D.N.Y. 2006); see also N.L.R.B. v. Bildisco and Bildisco, 465 U.S. 513, 528 (1984) ("The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."); In re Chateaugay Corp., 94 F.3d 772, 775 (2d Cir. 1996) (noting "important public policy favoring orderly reorganization and settlement of debtor estates"); In re Stanwich Fin. Servs. Corp., 288 B.R. 24, 26-27 (Bankr. D. Conn. 2002) ("A basic assumption that underlies American bankruptcy law is that it is often preferable to encourage and facilitate rehabilitation of businesses in financial trouble instead of providing for liquidation only.") (citation omitted).

    This comes as no surprise. French safeguard procedure was modeled after, and is regularly compared to, proceedings under Chapter 11 of the United States Bankruptcy Code. See Cafritz at 41 (noting that safeguard procedure was "inspired by the US bankruptcy system's Chapter 11 process"); Fabrice Robert-Tissot, The Effects of a Reorganization on (Executory) Contracts: A Comparative Law and Policy Study [United States, France, Germany and Switzerland], 21 Norton J. Bankr. L. & Prac. 5 Art. 4 (2012) (noting that the safeguard procedure "seems to be directly inspired from Chapter 11 of the U.S. Bankruptcy Code"); Adam Gallagher, Pre-Packs U.K. Style, French Debt Cancellation Law, Am. Bankr. Inst. J., Dec./Jan. 2008, at 94 (describing safeguard proceedings as "a kind of chapter 11 *à la française* to allow a company

that is in difficulty but is not yet formally insolvent to seek court protection before it actually becomes insolvent."); Weil, Gotshal & Manges LLP, *Comparative Guide to Restructuring Procedures 2012*, at 42-60 (2012) (noting that the safeguard procedure was modeled on Chapter 11 proceedings). That French safeguard procedure reflects the policies of U.S. bankruptcy law by design militates strongly in favor of extending comity. See Cunard, 773 F.2d at 459 (comity appropriate after determining that "[t]he principles of Swedish bankruptcy law [we]re not dissimilar to those of our Bankruptcy Code.").

Plaintiff asserts that under Chapter 11, unlike under French safeguard procedure, "creditors have a significant say in any reorganization plan that would modify the terms on which creditors will be paid" and that Chapter 11 provides protections for "the single largest, first ranking creditor." (Opp'n 13 n.42.) Again, however, Plaintiff cites no authority for the proposition that the treatment of first-line creditors under French safeguard procedures diverges so significantly from treatment of creditors under U.S. law such that this Court should hold the former regime to be violative of the public policy of the latter. See J.P. Morgan, 412 F.3d at 428 ("Nothing in the record before us suggests that the actions taken by the Mexican bankruptcy court are not approved or allowed by American law.").

### 5. Dellar's Guarantor Status

Plaintiff argues that "Dellar should not be allowed to use a foreign proceeding to prevent Plaintiff from pursuing claims against Dellar as a non-debtor guarantor in accordance with Dellar's New York law governed contract." (Opp'n 15.) Specifically, Plaintiff argues that:

> Dellar entered into a valid New York contract to induce Plaintiff to loan money to Borrower, and he expressly waived all defenses to enforcement of that contract in New York. If Dellar is allowed to avoid and rewrite his personal and direct obligations to Plaintiff via a safeguard repayment plan to which Plaintiff, as the largest and only secured creditor of Borrower, has not consented, that result will violate clear United States and New York law and public policy. New York and

16

United States law favors enforceability of non-debtor guaranties (as does French law in a true insolvency proceeding). Dellar should not be permitted to effect an end-run around New York law.

Id. 15-16 (internal citations omitted).

The issue here is properly framed not as whether Dellar seeks an impermissible "end-run" around his contractual obligations, but rather, as the Second Circuit has framed it, whether, Plaintiff's attempt to sue Dellar here constitutes "the sort of end-run around a parallel foreign bankruptcy proceeding of which [the Second Circuit has] repeatedly disapproved." JP Morgan, 412 F.3d at 427 (citing cases).

Courts have regularly answered that question in the affirmative, holding that parties' private agreements as to choice of forum or applicable law, or even as to waiver of the comity defense, must be subordinated to the "overarching concerns" the comity doctrine addresses, including "demonstrating a proper level of respect for the acts of other sovereign nations, ensuring fairness to litigants, and efficiently using scarce judicial resources." See United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc., 216 F. Supp. 2d 198, 212 (S.D.N.Y. 2002) (citation and internal quotation marks omitted). Rather, "[t]he presence of such clauses . . . does not preclude a court from granting comity where it is otherwise warranted." Allstate, 994 F.2d at 1000.

As Judge Baer explained in JP Morgan, where the relevant agreement contained a "waiver provision that appear[ed] to encompass the comity argument":

> In short, the presence of this waiver provision fails to change the rule and the result. As with a contract that contains only a forum-selection and choice-of-law provision, courts still determine that the considerations associated with comity trump the parties' express wishes. That the parties here appear to have stated their intentions with even more emphasis does not change the fact that there are important considerations that may not have concerned the parties then but which must concern this Court now—for example, Altos Hornos's other creditors and the importance of a unified administration rather than a piecemeal administration

> of its estate in the SOP proceeding. Dismissal on the ground of comity should
> prevail.

2004 WL 42268, at *7 (S.D.N.Y. Jan. 8, 2004); see also Cunard, 773 F.2d at 459 (policy of

deference to foreign bankruptcy proceedings prevails despite that "the strong public policy in

favor of arbitration is well recognized"); Export-Import Bank of Republic of China v. Grenada,

876 F. Supp. 2d 263, 269 (S.D.N.Y. 2012) ("While the enforcement of valid contracts and the

collection of valid judgments . . . are certainly important considerations, they do not outweigh

the commitment of the United States to principles of comity.") (citation and internal quotation

marks omitted); Kenner Prods. Co. v. Societe Fonciere et Financiere Agache-Willot, 532 F.

Supp. 478, 479-80 (S.D.N.Y. 1982) ("Nor do we find that the choice of venue clause contained

in the guaranty at issue overrides these concerns for comity and judicial efficiency. While such

clauses are prima facie valid, they are not enforceable if such enforcement would be

'unreasonable.'" (quoting M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10 (1972))).

Dellar is the president and a shareholder of Oui Management, and his obligations are

clearly closely intertwined with Oui Management's. Permitting Plaintiff to obtain a judgment

against him in this Court would very likely interfere with the implementation of the recently-

adopted safeguard plan. This is presumably why the FCC operates to stay actions against

individual guarantors as well as the debtor itself and why, now that the safeguard plan has been

approved, the FCC provides that creditors may not seek redress against Dellar outside the plan's

terms.

Under such circumstances, courts have declined to permit actions against debtor's

representatives when the debtor is subject to foreign proceedings. For example, upon

determining that dismissal of claims against the bankrupt entities was appropriate, the Allstate

court explained, as to claims against individual defendants:

> it cannot be said that the court abused its discretion where, as here, it would have been inefficient and inequitable to permit the individual claims to go forward. Indeed, since these individuals were sued solely because of their affiliation with the [bankrupt] companies, to allow these claims to go forward in the United States despite the dismissal as to the [bankrupt] companies would defeat the purpose of granting comity in the first place.

994 F.2d at 1000; see also Finanz AG, 192 F.3d at 242 (affirming district court's dismissal, on comity grounds, of complaint seeking to recover on promissory notes guaranteed by a defendant subject to Brazilian liquidation proceedings); Victrix, 825 F.2d at 714 (creditors "who obeyed the Swedish court's stay and sought relief only in the bankruptcy proceeding" would be affected by plaintiff's attempt to secure a "captive fund" elsewhere); United Feature Syndicate, 216 F. Supp. 2d at 212-213 (declining to consider breach of contract claims brought by New York distributor of newspaper features against officers of bankrupt Canadian corporation, to the extent that adjudication of claims "might interfere" with the equitable and orderly distribution of Canadian corporation through ongoing Canadian bankruptcy proceedings); Tradewell, Inc. v. Am. Sensors Electronics, No. 96 CIV. 2474 (DAB), 1997 WL 423075, at *4 (S.D.N.Y. July 29, 1997) (applying comity to breach of contract claim that would interfere with foreign bankruptcy proceedings).

To support its argument that it may proceed against Dellar, Plaintiff cites to Elliott Int'l L.P. v. Vitro, S.A.B. de C.V., 95 A.D.3d 565 (1st Dep't 2012), which affirmed judgments entered in two related actions in New York Supreme Court against guarantors of notes issued by a bankrupt Mexican glass manufacturer. On appeal, the defendants argued that comity required deference to the Mexican court supervising the company's bankruptcy proceeding. Id. at 565. Pointing to the fact that defendants executed a "broad, unconditional guaranty, signed indentures that included the express agreement that their obligations would be governed by New York law, waived any rights under Mexican laws, and irrevocably submitted themselves to the jurisdiction

of New York courts," the First Department held that "[i]t would prejudice plaintiffs for a New York court to ignore the express language of their bargained-for rights." Id. at 565-66.

Elliott is distinguishable. As noted above, there is minimal "prejudice" to Plaintiff here, as the already-approved safeguard plan provides for repayment of its loan. Further, in Elliott, the Mexican court rejected defendants' attempt to stay the New York case, "finding it unnecessary to involve itself" in the action. Id. at 566. This Court has received no such indication from French authorities. Indeed, the FCC expressly states that guarantors may invoke the plan. Finally, at least one recent case has distinghuished Elliott where the plaintiff "chose to affirmatively participate in the [foreign] proceeding," as the Court has found Plaintiff did here. Basile v. CAI Master Allocation Fund, Ltd., 966 N.Y.S.2d 344, at *8 (Sup. Ct. 2013).

The Court recognizes, as did the Elliott court, that New York generally has a "strong interest . . . in protecting the justifiable expectation of the parties who choose New York law as the governing law of a letter of credit." 95 A.D.3d at 566 (quoting Banco Nacional De Mexico, S.A. v. Societe Generale, 34 A.D.3d 124, 130 (1st Dep't 2006)). Elliott does not suggest, however, that the mere (and commonplace) insertion of a governing law clause in a guaranty by contracting parties must operate to foreclose courts' ability to later apply the principle of comity. Such a reading would allow private parties, unconcerned with the "spirit of cooperation" with which domestic courts must "approach[] the resolution of cases touching on the laws and interests of other sovereign states," Morgenthau, 11 N.Y.3d at 389, to strip those courts of the valuable discretion they are afforded in such cases. Rather, Elliott narrowly held that, on balance, "defendants-appellants failed to show that circumstances exist that warrant the extension of comity to a foreign court." 95 A.D.3d at 565; see also Sebastian Holdings, Inc. v. Deutsche Bank AG, 78 A.D.3d 446, 454 (2010) (A court is required to balance "'international

duty' against its obligation to protect the rights of 'persons . . . under the protection of its laws.'"
(quoting Hilton, 159 U.S. at 163-64)). The balance here tips in the other direction, as it has in
many other cases. See, e.g., Finanz AG, 192 F.3d at 247 (finding that "the particular need to
extend comity to foreign bankruptcy proceedings" outweighed the United States' "strong interest
in ensuring the enforceability of valid debts under the principles of contract law and in
maintaining New York's status as one of the foremost commercial centers in the world.")
(internal citations and quotation marks omitted). "To hold otherwise would undermine the
fundamental principles of comity by interfering with the acts of a foreign jurisdiction's
legislature or judicial body." Sung Hwan Co., Ltd. v. Rite Aid Corp., 7 N.Y.3d 78, 85 (2006).[10]

## 6. Conclusion

For the reasons set forth above, comity is warranted. Accordingly, Defendants' motion to
dismiss is granted and Plaintiff's partial motion for summary judgment is denied. The Clerk of
Court is respectfully directed to close items 22 and 31 on the docket and to terminate this case.

SO ORDERED.

Dated:     October 9, 2013
           New York, New York

                                         _____
                                         Ronnie Abrams
                                         United States District Judge

---

[10]      Because the Court grants Defendants' motion to dismiss on comity grounds, it does not reach their other
asserted bases for dismissal or the arguments raised in Plaintiff's motion.

# Rooney PC

Business Attorneys

May 29, 2013

<u>VIA EMAIL</u>

The Honorable Ronnie Abrams
United States District Judge
Southern District of New York
500 Pearl Street
New York, N.Y. 10017

Re: *Oui Financing LLC v. Dellar and Oui Management SAS*, 12-cv-7744

Dear Judge Abrams:

We write on behalf of Defendants Steven Dellar and Oui Management SAS ("Oui Management") to provide this Court with the appended opinion of the Commercial Court of Paris (the "Commercial Court"), as translated by our French counsel, setting forth the Commercial Court's reasons for approving the "Safeguard Plan" submitted by Oui Management in Safeguard Proceedings underway in that Court.

We respectfully submit that the contents of the opinion may be useful to this Court's consideration of Defendants' pending Motion to Dismiss, as well as Plaintiff's Motion for Partial Summary Judgment.  The opinion, which we did not receive from the Commercial Court until yesterday, May 28, 2013, was not available in time for submission by Defendants in conjunction with either motion.

If the Court feels it would be helpful, we would welcome the opportunity to elaborate on why we believe the contents of the opinion support Defendants' positions with regard to both motions.

Very Truly Yours,

s/ *Alex Kriegsman*

Alex Kriegsman

cc:    Ronald R. Jewell
       Samuel J. Abate, Jr.
       Laura M. Leitner

       Counsel for Plaintiff

Copies:
SELARL (limited liability independent contractor) Michel-
Miroite-Gorins
SELALFA (independent-contractor corp.) MJA, in the person of
Maître -Thomas Leloup
TPG
Prosecutor
Maître Julien Balensi (Selarl Altana) attorney
Registered letter with acknowledgement of receipt
SAS Oui Management
Ms. Caroline Doumeng
Mr. Steven Dellar

# PARIS COMMERCIAL COURT

# JUDGMENT OF MONDAY MAY 13, 2013 – 9 AM

# SECOND CHAMBER

General registry: 2013018271
22.04.2013
P.C. P201202512

SAS OUI MANAGEMENT, Paris business registry B 523 006 807, with headquarters at 20-22 Passage Dauphine, 75006 Paris.

## ADOPTS THE SAFEGUARD PLAN

- Mr. Steven Dellar, residing at 33 Rue du Four, 75006 Paris, President of SAS Oui Management, present and assisted by Maître Julien Balensi of Selarl Altana, attorney (R21);
- Mr. Mickael Lorieul, Cabinet DSA, 22 Place du Général Catroux, 75017 Paris, partner in certified public accounting firm, present;
- Ms. Caroline Doumeng, in her capacity of Representative of Employees, residing at 95 Rue de la Faisanderie, 75016 Paris, present;
- Selarl Michel-Miroite-Gorins in the person of Maître Gorins, 48 Rue La Fayette, 75009 Paris, judicial administrator, present;
- SELAFA MJA, in the person of Maître Leloup-Thomas, 102 Rue du Faubourg Saint Denis, CS 10023, 75479 Paris Cedex 10, judicial agent, present.

**AFTER COMMUNICATION OF THE PROCEEDINGS TO THE PUBLIC PROSECUTOR AND AFTER HAVING DELIBERATED**

In a judgment of September 24, 2012, the court opened a safeguard proceeding regarding SAS Oui Management with headquarters at 20-22 Passage Dauphine, 75006 Paris, represented by Mr Steven Dellar, of English nationality, President, residing at 33 Rue du Four, 75006 Paris.

This same judgment named Selarl A. Miroite – F . Michel – C. Gorins – N. Deshayes – C. Bidan in the person of Maître Gorins as Administrator, in its mission of supervision, and Selafa MJA in the person of Maître Leloup-Thomas as judicial agent. The said judgment opened a six-month period of observation, extended to June 24, 2013.

The company Oui Management, created in November 2010, is held for 99% by the English company Rosebery Investment Ltd, Mr Steven Dellar holding 1%.
Oui Management operates a modeling agency specialized in women's models over 16 years of age. This activity is strictly regulated in France. To exercise it, a license must be obtained and a financial guarantee must also be proven.
By decision 75.10.018 of September 24, 2010, the Prefect of the Ile de France Region awarded the License to Oui Management for a term of three years starting September 24, 2010, or until September 23, 2013.
The company also proves parental authorizations for models between 16 and 18 years of age.
Lastly, Oui Management provides a financial guarantee of an amount of €30,554.94 granted by Monte Paschi Banque until 31 July 2013.

Paris Commercial Court
Judgment of 05/13/2013 – 9 AM
2nd Chamber

[handwritten: 2A]
GR no.: 2013018271

MC* PAGE 2

The bulk of the company's activity consists in "placing" the models, in other words finding them contracts with stylists, photographers and advertisers. The company also manages all the operational part by organizing and coordinating the scheduling, transport, and lodging of its models.

The models are paid for each service.

Oui Management employs a staff of 9 permanent employees and had achieved a turnover of €3,239,142 as of March 31, 2012.

Oui Management also employs some one hundred models, whose status is stipulated by the terms of articles L.7123-5 and seq., and R.7123-1 and seq. of the Labor Code. A tripartite relation exists between Oui Management, the model and the customer of the Agency- so that several contractual relations exist.
Generally, a collaboration and representation agreement is concluded between Oui Management and the model, which defines the relations between them all through their collaboration. Furthermore, for each service, a specific employment contract is concluded between Oui Management and the model, which produces its effects only during the service furnished by the model.
Lastly, an availability contract is concluded between the Agency and the user specifying chiefly the characteristics of the services requested of the model.

The difficulties result from the inability, for lack of liquidity, to reimburse all of the loan from Oui Financing LLC concerning the total amount of €1,090,312.88, the term of which was initially set at September 30, 2011. After negotiation, the term was extended to September 30, 2012.
After the first repayments, the sum (capital and interest) that should have been repaid at this date came to nearly €870,000.

Thus, the burden of these financial commitments turns out to be too heavy with regard to the ability of Oui Management to generate adequate financing capacity.

Maître Gorins, judicial administrator, reported to the court by drawing up an economic and corporate assessment.
This report of March 15, 2013 has been filed with the clerk. It was communicated to the debtor, to the judicial agent, to the public prosecutor and, as the need may be, to the administrative authority competent in labor law.

The parties were asked to come to the Council Chamber on April 22, 2013 in accordance with the terms of article R.626-17 of the Commercial Code, and there appeared:

-   Maître Gorins, judicial administrator;
-   Maître Leloup-Thomas, judicial agent;
-   Mr. Steven Dellar, President, assisted by Maître Julien Balensi, attorney;
-   Ms. Caroline Doumeng, employee representative;
-   and Mr. Mickael Lorieul of the Cabinet DSA, certified public accountant.

The public prosecutor was lawfully advised of the hearing of the Council Chamber and was present.

The reports presented showed:

Paris Commercial Court
Judgment of 05/13/2013 – 9 AM
2nd Chamber

[handwritten: 3A]
GR no.: 2013018271

MC* PAGE 3

Oui Management's annual turnover comes to to:
For 2010, €1,640,246 with operating income of -€725,856.
For 2011, €3,239,142, with operating income of -€91,881.

The verified and filed liabilities come to the following:

| Reference liability | |
|---|---|
| Preferred | €952,812 |
| Unsecured (including current account of €500,000) | €504,482 |
| Disputed | €51,234 |
| Liabilities to fall due | €95,802 |
| Rejected liability | €16,681 |
| Admitted reference liability | €1,104,329.16 |

The procedures for discharging the liability of €1,104,329.16 will be the following:

- 100% payment of debts less than €300: settlement upon adoption of the plan in accordance with the terms of articles L.626-5 of the Commercial Code.
- Repayment of the balance of the liabilities in seven linear payments of 14.28%, the last being 14.32%. The first such payment shall occur at the latest on the anniversary date of the adoption of the safeguard plan.
- Repayment of the debt of the parent company Rosebery (€500,000) after discharging all the third-party liabilities subject to the plan.

All of the 13 creditors of Oui Management have been consulted, the holder of the Oui Finance loan representing 80.98% of the liability to be repaid:

- Six creditors answered the safeguard plan project favorably, or 7.40%;
- One creditor answered the safeguard plan unfavorably, or 80.98%;
- Five creditors did not answer in time, or 11.62%, while it is specified that these creditors are considered to have acquiesced to the safeguard plan.

During the Council Chamber of April 22, 2013, the following observations and answers were presented:

- **By the official administrator**

Maître Gorins feels that the forecasts established are reasonable and that the self-financing capacity is compatible with a repayment of the declared liabilities over only seven years without jeopardizing the sustainability of the company, and declares himself favorable to the adoption of the plan.

- **By the official agent**

Maître Leloup-Thomas indicates that the liabilities to be discharged could be increased in the event Oui Financing is relieved from the effects of the expiration of time, and issues a favorable opinion insofar as the settlement plan has received the agreement of all the other creditors and benefits from the support of its main shareholder, the debt of which is subordinate to the perfect execution of the plan, and it meets the criteria set by article L.620-1 of the Commercial Code.

Paris Commercial Court
Judgment of 05/13/2013 – 9 AM
2nd Chamber

[handwritten: 6A]
GR no.: 2013018271

MC* PAGE 4

- **By Mr. Steven Dellar**

Mr. Steven Dellar confirms his confidence in the future profitability of the operation and capacity of Oui Management to repay the liabilities, and agreed to institute an acceleration of repayment of the liabilities if the financial conditions allow it.

- **By Ms. Caroline Doumeng, employee representative**

Ms. Caroline Doumeng indicates she is favorable to the adoption of the safeguard plan.

- **By the official receiver**

The official receiver issued a favorable opinion.

- **By the vice-prosecutor**

Ms. Garrigue, first Vice Prosecutor, issued a favorable opinion to the adoption of the safeguard plan.

**WHEREUPON**

Given articles L.626-1 and seq. of the Commercial Code;
Given articles R.631-27 and seq. of the Commercial Code;

Given:
the provisions of articles L.620.1, L.626.1 and L.626.2 of the Commercial Code;
that the elements furnished by the judicial administrator verified the economic conditions of the continuance of operation;

Whereas:
Oui Management is operating in a regulated, competitive sector;
the proceedings made it possible to lay down the foundations for its growth and to confirm its longevity;
the plan proposed allows the maintenance of jobs and business and proposes the full repayment of the creditors in seven annual payments;
even if the plan proposed were rejected by the main creditor, who represents more than 80% of the liabilities, no alternative for maintaining employment, business and repayment of the liabilities is known;
thus there exists no other alternative to the safeguard plan except to consider official winding-up which, by definition allows neither the maintenance of the business and employment nor, in this case, repayment of the liabilities; at the hearing of the Council Chamber of April 22, 2013, Mr. Steven Dellar agreed to an acceleration of the liability repayment if the economic and/or financial conditions so allow;
subsequently, this plan seems credible;
the parties to the proceedings declared themselves favorable to the adoption of the safeguard plan;

therefore, after deliberation, the court shall adopt the proposed safeguard plan.

**ON SUCH GROUNDS**

The court, deciding after a public, adversarial hearing at first instance, the Official Receiver heard in his report;

Paris Commercial Court
Judgment of 05/13/2013 – 9 AM
2nd Chamber

[handwritten: 6A]
GR no.: 2013018271

MC* PAGE 5

adopts the safeguard plan of SAS Oui Management, with headquarters at 20-22 Passage Dauphine, 75006 Paris, listed in the Paris business registry under B523006807 (2010B15978), operating a business of provision of services; operation of a modeling agency and provision of photographic models; the presentation, promotion, dissemination of models and photographic and cinematographic models, the placing of models in the context of events, publications and advertising campaigns organized by third parties; the leasing of all premises, offices and depots, shops related to this purpose;

which will be implemented under his supervision by the receiver executing the plan, who will be designated hereafter;

Terminates the period of observation.

Sets the plan term at seven years.

Holds that the plan includes the following terms:

- 100% payment of debts less than €300: settlement upon adoption of the plan in accordance with the provisions of articles L.626-5 of the Commercial Code;
- Repayment of the balance of the liabilities in seven linear annuities of 14.28%, the last being 14.32%. The first such payment shall occur no later than the anniversary day of the adoption of the safeguard plan.
- Repayment of the debt of the parent firm Rosebery (€500,000) after settlement of the entirety of the third-party liabilities subject to the plan.

Names Mr. Steven Dellar to joint performance of the plan, and acknowledges the commitments taken in this regard and chiefly those expressed at the hearing of April 22, 2013.

If need be, orders the inalienability of the business of Oui Management for the duration of this plan.

States that the publicity of this inalienability shall be made by the agent upon execution of the plan under the conditions provided for in article R.626-25 of the Commercial Code.

Maintains Mr. Perraud as official receiver.

Names Mr. Messinesi as substitute official receiver.

Terminates the mission of Selarl A. Miroite – F. Michel – C. Goris – N. Deshayes – C. Bidan, 48 rue La Fayette, 75009 Paris, in the person of Maître Charles Gorins, judicial administrator, and names him as agent for the performance of the plan.

States that SAS Oui Management must establish a semi-annual accounting situation at its cost throughout the duration of the plan, by the certified public accountant of its choice, and remit it to the agent for the performance of the plan no later than 45 days after the retained date of adoption. If this situation is not remitted in this time, or if the situation presented reveals a degradation of the operation, the Agent for the performance of the plan must advise the court. Likewise if the situation presented allows the implementation of the acceleration of the repayment of the liabilities.

Holds that the agent for performance of the plan must file an annual report with the clerk of the Paris Commercial Court, on the conditions of performance of the plan in accordance with article R.626-43 of the Commercial Code.

Maintains Selafa MJA in the person of Maître Leloup-Thomas, 102 Rue du Faubourg Saint Denis, CS 10023, 75479 Paris Cedex 10, in his capacity as judicial agent until the end of the proceedings of verification of receivables, and the end-of-mission report.

Holds that the present decision is rightfully enforceable provisionally by application of article R.661-1 of the Commercial Code.

Holds that the expenses of this judgment liquidated at the sum of €129.02 including all taxes, €20.94 of which are VAT, as well as the publicity and notification costs to come, shall be included in the safeguard proceedings as preferential debts.

Paris Commercial Court
Judgment of 05/13/2013 – 9 AM
2nd Chamber

[handwritten: 6A]
GR no.: 2013018271

MC* PAGE 6

Retained at the hearing of the Council Chamber of April 22, 2013 where presided their honors Jean-Philippe Lotiz, Rémy Perraud, Noël Pouderoux, Jean Messinesi and Philippe Bernard; Deliberated upon by the same magistrates and issued at the public hearing of May 13, 2013 where presided their honors Mr. Jean-Philippe Klotz, Presiding Judge, Messrs Rémy Perraud, Noël Pouderoux, Jean Messinesi and Philippe Bernard, Judges, assisted by Mr. Laurent Cuny, Clerk.

The Original Copy of the Judgment is signed by Mr. Jean-Philippe Klotz, presiding the deliberations, and Mr. Laurent Cuny, Clerk.

[*signatures*]

*1A*



Copies :
SELARL Michel-Miroite-Gorins
SELAFA MJA prise en la personne de
Me Leloup-Thomas
T.P.G.
Parquet
Me Julien Balensi (Selarl Altana) avocat
LRAR :
SAS OUI MANAGEMENT
Mme Caroline Doumeng
M. Steven Dellar

## TRIBUNAL DE COMMERCE DE PARIS

## JUGEMENT DU LUNDI 13 MAI 2013 - 09H00

## DEUXIEME CHAMBRE

*1*  RG : 2013018271
22.04.2013
P.C.P201202512

- SAS OUI MANAGEMENT, RCS Paris n° B 523 006 807, dont le siège social est 20-22 passage Dauphine 75006 Paris.

### ARRETE LE PLAN DE SAUVEGARDE

- M. Steven Dellar, demeurant 33 rue du Four 75006 Paris, président de la SAS OUI MANAGEMENT, présent assisté de Me Julien Balensi de la Selarl Altana, avocat (R21).
- M. Mickael Lorieul - Cabinet DSA, 22 place du général Catroux 75017 Paris, associé cabinet expertise-comptable, présent.
- Mme Caroline Doumeng, en sa qualité de Représentant des Salariés, demeurant 95 rue de la Faisanderie 75016 Paris, présente.
- SELARL Michel-Miroite-Gorins en la personne de Me Gorins, 48 rue La Fayette 75009 Paris, administrateur judiciaire présent.
- la SELAFA MJA prise en la personne de Me Leloup-Thomas, 102 rue du faubourg Saint Denis - CS 10023 - 75479 Paris cedex 10, mandataire judiciaire, présente.

**APRES COMMUNICATION DE LA PROCEDURE AU MINISTERE PUBLIC ET APRES EN AVOIR DELIBERE**
Par jugement en date du 24 septembre 2012, le tribunal a ouvert une procédure de sauvegarde à l'égard de la SAS OUI MANAGEMENT dont le siège social est 20-22 passage Dauphine 75006 Paris représentée par M. Steven Dellar de nationalité anglaise, président, demeurant 33 rue du Four 75006 Paris.

Ce même jugement a désigné la SELARL A.Miroite-F.Michel-C.Gorins-N.Deshayes-C.Bidan en la personne de Me Gorins en qualité d'Administrateur, dans sa mission de surveillance et la SELAFA MJA en la personne de Me Leloup-Thomas en qualité de mandataire judiciaire. Ledit jugement a ouvert une période d'observation de 6 mois prorogée pour s'achever le 24 juin 2013.

La société OUI MANAGEMENT créée en novembre 2010 est détenue à 99% par la société ROSEBERY INVESTMENT LTD de droit anglais, M. Steven Dellar détenant 1%.
La société OUI MANAGEMENT exploite une agence de mannequins spécialisée dans les modèles féminins âgés de plus de 16 ans. Cette activité est strictement réglementée en France, pour l'exercer il est nécessaire d'obtenir une licence et de pouvoir justifier en outre d'une garantie financière.
Par arrêté n° 75.10.018 en date du 24 septembre 2010, le Préfet de la Région Ile-de-France a attribué la Licence à la société OUI MANAGEMENT, pour une durée de 3 ans, à compter du 24 septembre 2010, soit jusqu'au 23 septembre 2013.
La société justifie également d'autorisations parentales pour les mannequins âgés entre 16 et 18 ans.
Enfin la société OUI MANAGEMENT justifie d'une garantie financière d'un montant de 30 554,94 € consentie par la MONTE PASCHI BANQUE jusqu'au 31 juillet 2013.



MC* - PAGE 1

L'essentiel de l'activité de la société consiste à « placer » les modèles, autrement dit à trouver des contrats auprès des stylistes, photographes et publicitaires. La société gère également toute la partie opérationnelle en organisant et coordonnant le planning, le transport, le logement de ses mannequins.
Les mannequins sont rémunérés pour chaque prestation.

La société OUI MANAGEMENT emploie un effectif de 9 salariés permanents et a réalisé au 31 mars 2012 un chiffre d'affaires de 3.239.142 €.

La société OUI MANAGEMENT emploie également une centaine de mannequins dont le statut est prévu par les dispositions des articles L.7123-5 et suivants et R.7123-1 et suivants du Code du Travail. Une relation tripartite existe entre la société OUI MANAGEMENT, le mannequin et le client de l'Agence) de sorte que plusieurs relations contractuelles existent.
Généralement une convention de collaboration et de représentation est conclue entre la société OUI MANAGEMENT et le mannequin, laquelle définit les rapports entre eux tout au long de leur collaboration. Par ailleurs, pour chaque prestation, un contrat de travail spécifique est conclu entre la société OUI MANAGEMENT et le mannequin qui ne produit toutefois effet que pendant la durée de la prestation fournie par le mannequin.
Enfin, un contrat de mise à disposition est conclu entre l'Agence et l'utilisateur précisant notamment les caractéristiques de la prestation demandée au mannequin.

Les difficultés résultent de l'incapacité, par manque de liquidités, de rembourser en totalité de son emprunt auprès de la société OUI FINANCING LLC portant sur la somme totale de 1.090.312,88 € et dont le terme était fixé initialement au 30 septembre 2011. Après négociation, le terme a été reporté au 30 septembre 2012.
Suite à des premiers remboursements, la somme qui aurait dû être remboursée à cette date (capital et intérêts) s'élevait à près de 870.000 €.

Ainsi la charge de ces engagements financiers s'avère trop lourde aux regards de l'aptitude de la société OUI MANAGEMENT à générer une capacité de financement suffisante.

Me Gorins, administrateur judiciaire, a fait rapport au tribunal en dressant le bilan économique et social;
Ledit rapport en date du 15 mars 2013 a été déposé au greffe. Il a été communiqué au débiteur, au mandataire judiciaire, au ministère public et en tant que de besoin à l'autorité administrative compétente en matière de droit du travail.

Les parties ont été invités à se présenter en chambre du conseil le 22 avril 2013 conformément aux dispositions de l'article R.626-17 du code de commerce, et ont comparu :

-        Me Gorins, administrateur judiciaire,
-        Me Leloup-Thomas, mandataire judiciaire,
-        M. Steven Dellar président, assisté de Me Julien Balensi, avocat,
-        Mme Caroline Doumeng représentante des salariés,
-        Et M. Mickael Lorieul du Cabinet DSA, expert-comptable.

Le ministère public a été régulièrement avisé de l'audience de la chambre du conseil et était présent.

Les rapports présentés font ressortir :



3A

Le chiffre d'affaires de la société OUI MANAGEMENT s'élève :
Pour 2010 à la somme de 1.640.246 €, avec résultat d'exploitation de - 725.856 €.
Pour 2011 à la somme de 3.239.142 €, avec résultat d'exploitation de – 91.881 €.

Le passif vérifié et déposé s'établit comme suit :

| Passif de référence | |
|---|---|
| - Privilégiés | 952.812 € |
| - Chirographaires (dont 500.000 € de compte courant) | 504.482 € |
| - Contesté | 51.234 € |
| - Passif à échoir | 95.802 € |
| - Passif rejeté | 16.681 € |
| - Passif admis de référence | **1.104.329,16 €** |

Les modalités d'apurement du passif de 1.104.329,16 € seront les suivantes :

• 	Paiement à 100% créances inférieures à 300 € : règlement dès l'arrêté du plan conformément aux dispositions des articles L.626-5 du Code de commerce.
• 	Remboursement du solde du passif en 7 échéances linéaires de 14.28% la dernière étant de 14,32%. Le règlement de la première intervenant au plus tard le jour anniversaire de l'arrêté du plan de sauvegarde :
• 	Remboursement de la créance de la société mère ROSEBERY (500.000 €) après apurement de l'intégralité du passif tiers soumis au plan.

La totalité des 13 créanciers de la société OUI MANAGEMENT ont été consultés, le titulaire du prêt OUI FINANCE représentant 80,98% du passif à rembourser :

- 6 créanciers ont répondu favorablement au projet de plan de sauvegarde soit 7,40%.
- 1 créancier a répondu défavorablement au projet de plan de sauvegarde soit 80,98%
- 5 créanciers n'ont pas répondu dans les délais soit 11,62% étant précisé que ces créanciers sont réputés avoir acquiescé au plan de sauvegarde.

Au cours de la chambre du conseil du 22 avril 2013, les observations et les réponses suivantes ont été présentées :

❑ 	**Par l'administrateur judiciaire :**
Me Gorins estime que les prévisions établies sont raisonnables et qu'ainsi la capacité d'autofinancement est compatible avec un remboursement du passif déclaré que sur 7 ans sans hypothéquer la pérennité de la société et se déclare favorable à l'adoption du plan.

❑ 	**Par le mandataire judiciaire :**
Me Leloup-Thomas indique que le passif à apurer pourrait être augmenté en cas de relevé de forclusion de la société OUI FINANCING et émet un avis favorable dans la mesure où le plan d'apurement,
a reçu l'accord de tous les autres créanciers et bénéficie du soutien de son principal actionnaire dont la créance est subordonnée à la parfaite exécution du plan et qu'il répond aux critères fixés par l'article L 620-1 du Code de commerce.

Tribunal de commerce de Paris
Jugement du 13/05/2013 - 09h00
2ème chambre

N° RG : 2013018271

MC* - PAGE 4

     ❑          **Par M. Steven Dellar:**
M. Steven Dellar confirme sa confiance dans la rentabilité à venir de l'exploitation et de la capacité de OUI MANAGEMENT à rembourser le passif et s'est engagé à mettre en place une accélération du remboursement du passif si les conditions financières le permettraient.

     ❑          **Par Mme Caroline Doumeng représentante des salariés :**
Mme Caroline Doumeng indique être favorable à l'adoption du plan de sauvegarde.

     ❑          **Par le juge-commissaire :**
M. le juge commissaire émet un avis favorable.

     ❑          **Par le vice procureur de la République :**
Mme Garrigue 1ère Vice Procureur de la République émet un avis favorable à son adoption du plan de sauvegarde.

**SUR QUOI,**
Vu les articles L.626-1 et suivants du Code de commerce,
Vu les articles R.631-27 et suivants du Code de commerce,

Attendu des dispositions des articles L.620.1, L.626.1 et L.626.2 du code de commerce ;
Attendu que les éléments fournis par l'administrateur judiciaire ont permis de vérifier les conditions économiques de la poursuite d'exploitation ;
Attendu que la société OUI MANAGEMENT évolue dans un secteur réglementé et concurrentiel ;
Attendu que la procédure a permis de poser les bases de sa croissance et d'en confirmer la pérennité ;
Attendu que le plan proposé permet le maintien des emplois et de l'activité et propose le remboursement intégral des créanciers en 7 annuités ;
Attendu que même si le plan proposé a été rejeté par le créancier principal qui représente plus de 80% du passif aucune alternative pour maintenir l'emploi, l'activité et rembourser le passif n'est connue ;
Attendu qu'ainsi n'existe pas d'autre alternative au plan de sauvegarde sauf à considérer la liquidation judiciaire qui par essence ne permet ni le maintien de l'activité et de l'emploi ni en l'espèce de rembourser le passif ;
Attendu qu'à l'audience de la chambre du conseil du 22 avril 2013 M. Steven Dellar s'est engagé à une accélération du remboursement du passif si les conditions économiques et/ou financières le permettraient ;
Attendu subséquemment que ce plan apparaît crédible ;
Attendu que les parties à la procédure se sont déclarées favorables à l'adoption du plan de sauvegarde ;

En conséquence après en avoir délibéré, le tribunal adoptera le plan de sauvegarde proposé.

**PAR CES MOTIFS**
Le tribunal statuant publiquement par jugement contradictoire et en premier ressort, monsieur le juge commissaire entendu en son rapport ;

Arrête le plan de sauvegarde de la SAS OUI MANAGEMENT dont le siège social est 20-22 passage Dauphine 75006, immatriculée sous le numéro B523006807 (2010B15978) au Registre du Commerce et des Sociétés de Paris, exerçant comme activité la prestation de services; l'exploitation d'une agence de mannequins et modèles photographiques; la présentation, la promotion la diffusion de mannequins et de modèles photographiques et cinématographiques; le

placement de mannequins et modèles dans le cadre d'évènements, publications et campagnes publicitaires organisés par des tiers; la prise à bail en location gérance de tout local, bureau et entrepôt, boutique ayant trait à cet objet ;
qui sera mis en œuvre sous son contrôle par le commissaire à l'exécution du plan qui sera désigné ci-après ;
Met fin à la période d'observation.
Fixe la durée du plan à 7 ans.
Dit que le plan comprend les dispositions suivantes :
▪       Paiement à 100% créances inférieures à 300 € : règlement dès l'arrêté du plan conformément aux dispositions des articles L.626-5 du Code de commerce.
▪       Remboursement du solde du passif en 7 échéances linéaires de 14.28% la dernière étant de 14,32%. Le règlement de la première intervenant au plus tard le jour anniversaire de l'arrêté du plan de sauvegarde :
▪       Remboursement de la créance de la société mère ROSEBERY (500.000 €) après apurement de l'intégralité du passif tiers soumis au plan.
Désigne M. Steven Dellar, comme tenu d'exécuter conjointement le plan, et constate les engagements pris à cet égard et notamment ceux exprimés à l'audience du 22 avril 2013.
Prononce en tant que de besoin l'inaliénabilité du fonds de commerce de la société OUI MANAGEMENT pendant la durée du présent plan.
Dit que la publicité de cette inaliénabilité sera effectuée par le commissaire à l'exécution du plan dans les conditions prévues à l'article R.626-25 du code de commerce.
Maintient M. Perraud juge commissaire.
Désigne M. Messinesi juge commissaire suppléant.
Met fin à la mission de la SELARL A.Miroite-F.Michel-C.Gorins-N.Deshayes-C.Bidan, 48 rue La Fayette 75009 Paris, en la personne de Me Charles Gorins administrateur judiciaire et la désigne en qualité de commissaire à l'exécution du plan.
Dit que la SAS OUI MANAGEMENT pendant toute la durée du plan, devra faire établir, à ses frais, une situation comptable semestrielle, par l'expert-comptable de son choix et la remettre à M. le commissaire à l'exécution du plan au plus tard 45 jours après la date d'arrêté retenue. Si cette situation n'est pas remise dans ce délai ou si la situation présentée révélait une dégradation de l'exploitation, M. le commissaire à l'exécution du plan devra saisir le tribunal il en sera de même si la situation présentée permettrait la mise en œuvre de l'accélération du remboursement du passif.
Dit que le commissaire à l'exécution du plan devra déposer au greffe du tribunal de commerce de Paris un rapport annuel sur les conditions d'exécution du plan conformément à l'article R.626-43 du Code de commerce.
Maintient la SELAFA MJA prise en la personne de Me Leloup-Thomas, 102 rue du faubourg Saint Denis - CS 10023 - 75479 Paris cedex 10, en sa qualité de mandataire judiciaire jusqu'à la fin de la procédure de vérification des créances, ainsi que le compte rendu de fin de mission.
Dit que la présente décision est exécutoire de plein droit à titre provisoire en application de l'article R.661-1 du Code de commerce.
Dit que les dépens du présent jugement liquidés à la somme de : 129,02 € T.T.C. dont 20,94 € de T.V.A., ainsi que les frais de publicité et de notification à venir, seront portés en frais privilégiés de la procédure de sauvegarde.

Retenu à l'audience de la chambre du conseil du 22 avril 2013 où siégeaient MM. Jean-Philippe Klotz, Rémy Perraud, Noël Pouderoux, Jean Messinesi et Philippe Bernard;
Délibéré par les mêmes magistrats et prononcé à l'audience publique du 13 mai 2013 où siégeaient : M. Jean-Philippe Klotz, président, MM. Rémy Perraud, Noël Pouderoux, Jean Messinesi et Philippe Bernard, juges, assistés de M. Laurent Cuny, greffier;

6A

Tribunal de commerce de Paris
Jugement du 13/05/2013 - 09h00
2ème chambre

N° RG : 2013018271

MC* - PAGE 6

La Minute du Jugement est signée par M. Jean-Philippe Klotz, président du délibéré, et M. Laurent Cuny, greffier